# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA and
STATE OF FLORIDA, *ex rel.* [UNDER
SEAL],

Plaintiffs,

v.

[UNDER SEAL],

Defendants.

_____/

Case No.: 8:15 CV 2030 T33 TBM

**FILED IN CAMERA AND
UNDER SEAL PURSUANT
TO 31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

## COMPLAINT

{00065968; 1 }

TRA-31970      $400

S-1



## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF FLORIDA, *ex rel.* FRANCIS DEL PINTO, | Case No.: |
| Plaintiffs, | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| v. | **JURY TRIAL DEMANDED** |
| FLORIDA HEALTH PARTNERS, INC., FLORIDA BEHAVIORAL HEALTH, INC., VALUEOPTIONS, INC., and BEACON HEALTH OPTIONS, INC., | |
| Defendants. | |
| _____/ | |

## COMPLAINT

*Qui Tam* Plaintiff and Relator Francis Del Pinto ("Relator"), through his attorneys Phillips & Cohen LLP, on behalf of the United States of America and the State of Florida (collectively, "the Government"), for his Complaint against Defendants Florida Health Partners, Inc., Florida Behavioral Health, Inc., ValueOptions, Inc., and Beacon Health Options, Inc. (collectively "Defendants"), alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.   INTRODUCTION

1.     This is an action to recover damages and civil penalties on behalf of the Government arising from false and/or fraudulent statements, records, and claims made and caused to be made by Defendants and/or their agents, employees, and co-conspirators in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 *et seq.*

2.      Between 1996 and 2014, Florida's Medicaid program contracted with managed care organizations known as Prepaid Mental Health Plans ("PMHPs") to cover behavioral health services for Medicaid beneficiaries.  In exchange for covering behavioral health services, the Medicaid program paid the PMHPs a fixed monthly premium per beneficiary.

3.      In 2002, Florida enacted a law to ensure that the Medicaid program received fair value for the premiums it was paying.  Under the law, codified at Fla. Stat. § 409.912(b)(4), PMHPs were required to spend at least 80% of the premiums they received on direct behavioral health services, with the remaining 20% allocated to administrative expenses, overhead, and profit.  If the PMHP did not spend 80% of its premiums on covered services, it had to return the difference to Medicaid.  The rule reflected Florida's concern that high overhead and profits among managed care organizations would result in Medicaid paying premiums well in excess of the benefits its beneficiaries received.  By limiting premiums to no more than 125% of the amount spent on behavioral health services, Florida sought to increase the transparency and accountability of the PMHP program and to decrease the program's cost to Medicaid.

4.      Defendant Florida Health Partners, Inc. ("FHP") is a joint venture of Defendant ValueOptions, Inc. and Defendant Florida Behavioral Health, Inc. ("FBH"), and was the designated PMHP for several counties in the Tampa Bay region.  In or about April 2013, Defendants projected that FHP's annual expenditures on behavioral health services would fall below 80% of the premium payments it received from Florida Medicaid, which would require FHP to refund the excess payments to Medicaid.  To avoid that obligation, Defendants retroactively increased FHP's reimbursement rates for certain providers until its behavioral health expenses reached 80% of its premiums.  Moreover, the providers that received the increased reimbursement were members of FHP's board of directors and voted to approve the

retroactive increase.  Through this scheme, Defendants fraudulently inflated the expenditures

that FHP reported to Medicaid, retaining excess premiums that were due to Medicaid under

Florida law and the terms of FHP's Medicaid contract.  At all relevant times, Defendants knew

that FHP's rate increases were solely for the purpose of avoiding the "80/20" requirement, and

did not reflect the provision of behavioral health services.

5.      Defendants' conduct violates the False Claims Act and the Florida False Claims

Act.  The False Claims Act was originally enacted during the Civil War.  Congress substantially

amended the Act in 1986 to enhance the ability of the United States Government to recover

losses sustained due to fraud against it.  Congress amended the Act after it found that fraud in

federal programs was pervasive and that the Act, which Congress characterized as the primary

tool for combating government fraud, was in need of modernization.  Congress intended the

amendments to create incentives for individuals with knowledge of fraud against the

Government to disclose the information without fear of reprisals or Government inaction.

Congress also sought to encourage the private bar to commit legal resources to prosecuting fraud

on the Government's behalf.

6.      The False Claims Act prohibits:  (1) knowingly presenting, or causing to be

presented, to the federal government a false or fraudulent claim for payment or approval; (2)

knowingly making or using, or causing to be made or used, a false or fraudulent record or

statement material to a false or fraudulent claim; (3) knowingly making, using, or causing to be

made or used, a false record or statement material to an obligation to pay or transmit money or

property to the federal government, or knowingly concealing or knowingly and improperly

avoiding or decreasing an obligation to pay or transmit money or property to the federal

government; and (4) conspiring to violate any of these provisions.  31 U.S.C. § 3729(a)(1)(A)–

(C), (G). Any person who violates the Act is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages the United States sustains. *Id.* § 3729(a)(1).

7. Defendants' actions also violate the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 *et seq.* That law similarly prohibits: (1) knowingly presenting, or causing to be presented, a false or fraudulent claim to the Florida State Government for payment or approval; (2) knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim; (3) knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the state; and (4) conspiring to violate any of these provisions. *Id.* § 68.082(2)(a)–(c), (g).

8. Both the False Claims Act and Florida False Claims Act allow any person having information about a violation of the Act to bring an action on behalf of the government and to share in any recovery. The Acts require the Complaint to be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

9. Based on these provisions, Relator seeks to recover all available damages, civil penalties, and other relief for federal and state-law violations alleged in this Complaint in every jurisdiction to which Defendants' misconduct has extended.

## II.   **PARTIES**

10. *Qui Tam* Plaintiff and Relator Francis Del Pinto is a resident of Ohio. Relator has over twenty-five years' experience in the managed care industry, with expertise in contracting and network development. Relator joined ValueOptions in August 2012 as its National Vice

President for Contracting, Strategy and Solutions.  In that capacity, Relator was responsible for

managing ValueOptions' provider contracting functions nationwide, as well as developing its

provider networks and network strategies.  Relator was located in North Carolina and Ohio

during his employment with ValueOptions, though he traveled to other offices regularly.  Relator

held the position until December 2013, when he resigned from the company.  Prior to his

employment with ValueOptions, Relator served as Director of Contracting for CIGNA

Healthcare from March 2008 through September 2012.

11.     Defendant ValueOptions is a Virginia corporation with its principal place of

business in Norfolk, Virginia.  ValueOptions is national behavioral-health maintenance

organization.  The company's operations are organized into Commercial, Federal, and Public

Sector Divisions.  The Commercial Division manages contracts with commercial health plans

and employer groups, while the Federal Division manages contracts with TRICARE and other

federal programs.  The Public Sector Division provides managed behavioral health services

through the Medicaid program, holding Medicaid contracts with at least 14 states, including

Florida.  ValueOptions maintains a Public Sector Division Office in Tampa, Florida.  Prior to its

merger with Beacon Health Strategies on December 23, 2014, ValueOptions was a wholly-

owned subsidiary of First Hospital Corporation.

12.     Defendant Beacon Health Options, Inc. is a Delaware corporation with its

principal place of business in Boston, Massachusetts.  Beacon Health Options was formed by the

merger of ValueOptions and Beacon Health Strategies in December 2014.  Beacon Health

Options is a privately-held company, owned by Diamond Castle Holdings, Amulet Capital

Partners, and Bain Capital.

13.     Defendant Florida Behavioral Health ("FBH") is a Florida nonprofit corporation with its principal place of business in Tampa, Florida.  During the relevant time period, FBH acted as a regional organization of community mental-health centers and mental-health provider agencies.  FBH's providers were organized into separate, provider-sponsored networks, with each network represented on FBH's governing board.  FBH's network for the Tampa Bay area was called "Pioneer," and consisted of the following providers:  Manatee Glens in Bradenton; Mental Health Care, Inc. in Tampa; Northside Mental Health Center in Tampa; Peace River Center in Bartow; and the Behavioral Health Division of Winter Haven Hospital, Inc., in Lakeland.

14.     Defendant Florida Health Partners ("FHP") is a Florida corporation with its principal place of business in Tampa, Florida.  During the relevant time period, FHP was a joint-venture partnership between ValueOptions and FBH.  ValueOptions and FBH each owned 50% of FHP and had equal representation on FHP's governing board.  ValueOptions was FHP's managing shareholder.

## III.    JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  In addition, 31 U.S.C. § 3732(b) confers jurisdiction on this Court over the state-law claim asserted in Count II of this Complaint.

16.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because Defendants have minimum contacts with the United States.  Moreover, Defendants can be found in, reside, and/or transact or have transacted business in this District.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transact or have transacted business in this District.  At all times relevant to this Complaint, Defendants regularly conducted substantial business, maintained employees, and/or made significant sales in this District.  In addition, statutory violations, as alleged in this Complaint, occurred in this District.

## IV.     APPLICABLE LAW

### A.     The Medicaid Program

18.     Medicaid was created in 1965 under Title XIX of the Social Security Act.  The federal government and states that participate in the program jointly fund it.  Participating states receive federal money to provide certain medical services to low-income persons who are blind, disabled, or members of families with dependent children or qualified pregnant women or children.  42 U.S.C. § 1396 *et seq.*  The federal government reimburses states for a portion of their Medicaid expenditures based on a formula tied to each state's per-capita income.  *Id.* § 1396b(a)(1).  The federal share of Medicaid expenditures varies for each state, but is no less than 50% of a state's total Medicaid expenditures.

19.     The Centers for Medicare and Medicaid Services ("CMS") is an agency of the United States Department of Health and Human Services ("HHS").  CMS is the federal governmental body responsible for administrating the Medicaid program.  States electing to participate in the Medicaid program must comply with the requirements of the Social Security Act, as well as regulations the Secretary of HHS imposes.

20.     CMS authorizes each state to establish a state agency to oversee the Medicaid program.  Florida established the Agency for Health Care Administration ("AHCA") as the single state agency authorized to administer the Florida Medicaid program.  Fla. Stat. Ann. § 409.902(1).  AHCA reimburses healthcare plans and providers authorized to render Medicaid-

covered services to Medicaid beneficiaries. Healthcare plans and providers must meet certain conditions of participation and eligibility requirements to receive payments from AHCA.

**B.**    **Prepaid Mental Health Plans and Florida Medicaid's 80/20 Requirement**

21.    AHCA oversees and administers Florida's Medicaid program through 11 regional service areas, each of which comprises one or more counties. AHCA's service area 6, for example, consists of Hillsborough, Manatee, Polk, Hardee, and Highlands counties.

22.    Beginning in 1996, AHCA established a managed-care program, the Prepaid Mental Health Plan ("PMHP"), to coordinate the delivery of behavioral-health services for Medicaid beneficiaries who were enrolled in Florida's Medicaid Provider Access System ("MediPass"). MediPass was a primary care case management system within Medicaid that operated primarily on a fee-for-service basis. In certain counties, beneficiaries who enrolled in MediPass would also be enrolled in a PMHP for coverage of behavioral health services. For such beneficiaries, MediPass managed and provided physical health care services, while the PMHP managed and provided behavioral health services. Unlike MediPass, PMHPs provided behavioral health benefits through a managed care model. Florida discontinued the MediPass and PMHP programs in or around August 2014 as part of the implementation of the Statewide Medicaid Managed Care program, and all MediPass enrollees were transferred to Managed Medical Assistance plans for all covered services.

23.    Under the PMHP program, AHCA awarded contracts to behavioral health management organizations to provide behavioral health services for Medicaid beneficiaries. PMHPs were required to cover community mental-health care, targeted case management, and psychiatric inpatient services, among others.

24.    AHCA paid PMHPs a fixed monthly premium per beneficiary, often known as a "capitation" payment, to cover the behavioral health services. By accepting "capitation

payments," PMHPs agreed to assume financial risk for delivering all covered services, regardless of whether the payment fully covered the cost of all covered services a beneficiary needed.

25.     The amount of the PMHP's fixed monthly premiums—*i.e.*, its "capitation rate"— was based on prior utilization and other factors.

26.     PMHPs contracted with behavioral health providers, including community mental-health centers and mental-health provider agencies, to provide services to covered beneficiaries.  The provider contracts typically adopted one of three payment models.  First, the PMHP could pay the provider on "fee-for-service" basis, under which the provider would receive a negotiated fee for each covered service it performed.  Second, the PMHP could compensate the provider at a fixed percentage of the PMHP's capitation payments.  This "sub-capitation" model extended to the provider the same financial risks and rewards as the PMHP.  Third, and less commonly, the PMHP could enter into a "fixed-fee" contract with the provider, where the provider was paid a set amount each month to provide a certain set of services to beneficiaries.

27.     Florida law and AHCA's contracts obligated PMHPs to expend 80% of AHCA's premiums on the provision of behavioral health services.  In the event that a PMHP spent less than 80% of its premiums on behavioral health services, it was required to return the excess premiums to AHCA.  This requirement, known as the 80/20 requirement, provided in pertinent part:

> To ensure unimpaired access to behavioral health care services by Medicaid recipients, all contracts issued pursuant to this paragraph must require 80 percent of the capitation paid to the managed care plan, including health maintenance organizations and capitated provider service networks, to be expended for the provision of behavioral health care services.  If the managed care plan expends less than 80 percent of the capitation paid for the provision of behavioral health care services, the difference shall be returned to the agency.

Fla. Stat. Ann. § 409.912(4)(b).

28.     AHCA's contracts with PMHPs for behavioral health services included similar provisions.  Specifically, those contracts included language identical, or substantially similar, to the following:

> [I]n accordance with [§] 409.912, [Florida Statutes], eighty percent (80%) of the capitation rate paid to the Health Plan by the Agency shall be expended for the direct provision of community behavioral health services.  In the event the Health Plan expends less than eighty percent (80%) of the capitation rate, the Health Plan shall return the difference to the Agency no later than April 1 of each Contract year.

29.     The contracts defined "community behavioral health services" as those services that the PMHP was required to provide as listed in the AHCA Community Behavioral Health Services Coverage and Limitations Handbook and the AHCA Mental Health Targeted Case Management Coverage and Limitations Handbook.

30.     The contracts defined "expended" as the total amount, in dollars, paid directly or indirectly to community behavioral health services providers solely for the provision of community behavioral health services, not including administrative expenses or overhead of the PMHP.

31.     To facilitate the mandatory reporting of expenditures relating to the provision of the behavioral health services, AHCA required PMHPs to file a Behavioral Health Annual 80/20 Expenditure Report, or other similarly titled report ("Expenditure Report").  In the Expenditure Report, the PMHP disclosed its spending on behavioral health services and the amount of the refund, if any, due to AHCA under the 80/20 requirement.  If the PMHP reported excess premiums, it was required to pay the refund at the time it filed the Expenditure Report.

32.     A PMHP was also required to submit with the Expenditure Report an attestation, "signed by the PMHP's chief executive officer (CEO), chief financial officer (CFO) or a direct

report with written delegated authority[,] certifying that all data and documents submitted are accurate, truthful, and complete to the best of the official's knowledge."

33.     In addition to the requirements and obligations above, AHCA's contracts required PMHPs to return any overpayments to the agency within forty days, with language identical, or substantially similar, to the following:

> The Provider agrees: . . . To return to the agency any overpayments due to unearned funds or funds disallowed pursuant to the terms of this contract that were disbursed to the provider by the agency. The provider shall return any overpayment to the agency within forty (40) calendar days after either discovery by the provider, its independent auditor, or notification by the agency, of the overpayment.

## V.     ALLEGATIONS

34.     FHP was a PMHP that entered into contracts with AHCA to provide behavioral health services in AHCA service areas 5, 6, 7, and 8.  FHP held a separate contract with AHCA for each service area.  Payments under FHP's contract were made by AHCA and reflected federal and state funds exclusively.

35.     During the relevant time period, FHP was organized as a joint venture between ValueOptions and FBH, with each corporation owning an equal share of FHP.  Because ValueOptions is a for-profit behavioral health maintenance organization and FBH is a network of nonprofit service providers, FHP considered itself a public-private partnership.  Within the joint venture, ValueOptions served as FHP's managing partner and provided it with management and administrative services.  The positions of President and Medical Director of FHP were staffed with ValueOptions employees.  As a result, ValueOptions was primarily responsible for FHP's decision-making, subject only to the oversight of the FBH directors on FHP's board.

36.     Under the terms of the joint venture, FHP contracted with FBH's network of providers, as well as other community behavioral-health organizations, to provide behavioral

health services to Medicaid beneficiaries under the PMHP contracts.  FHP contracted with ValueOptions to coordinate and manage the delivery of those services.

37.     FHP was required to spend 80% of the capitation payments it received from AHCA under each PMHP contract on the provision of behavioral-health services, and to return to AHCA any funds that FHP did not expend on the provision of such services.

38.     As set forth below, Defendants knowingly and willfully executed a scheme to defraud the Florida Medicaid program by means of false claims and false representations in order to retain excessive payments from Medicaid and to inflate its Medicaid capitation rates.

### A.     Defendants' Scheme to Avoid Refunding Payments to Florida Medicaid

39.     In or around April 2013, ValueOptions prepared internal financial projections for FHP's contract covering AHCA service area 6.  FHP's financial results for the first and second quarters of 2013 showed that FHP was spending less than 80% of its capitation payments on the provision of behavioral health services.  Based on those results, ValueOptions projected that FHP's annual expenditure for behavioral health services would fall short of the 80/20 requirement by as much as 10%.

40.     From that projection, FHP and its managing partner, ValueOptions, concluded that FHP would be required to refund to Medicaid a significant amount of the premiums it had received and would receive in 2013.  FHP and ValueOptions expected that FHP would have to pay the refund sometime after April 2014, when it was scheduled to file its next Expenditure Report with AHCA.

### a.     FHP Increased Rates to Inflate its Behavioral Health Expenditures

41.     To avoid their obligation to refund money to Medicaid, FHP and ValueOptions designed and implemented a scheme to artificially increase the percentage of the capitation

{00065968; 1 }                                    12

payments that FHP spent on behavioral health services, such that FHP would meet or surpass the requirements of the 80/20 rule.

42.     Through the scheme, FHP inflated its payments to contracted providers (which were primarily the providers in FBH's network) by setting higher reimbursement rates for covered services. The increased payments were applied retroactively and artificially inflated FHP's apparent spending on behavioral health services. This, in turn, artificially increased the amount of Medicaid premiums that FHP retained. Indeed, through its scheme, FHP inflated reimbursements so much that it avoided refunding any of the overpayments to Medicaid.

43.     The payments to the network providers benefitted Defendants in at least two ways. First, FHP directed the excess payments to certain providers that also were members of its board of directors and thus formed a powerful constituency within the joint venture. ValueOptions intentionally inflated FHP's payments to those providers rather than return the funds to Medicaid, while the providers themselves (through FBH) readily approved the increase to their own reimbursement from the plan. In that regard, FHP's decision to distribute the Medicaid funds to the providers was an act of self-dealing, since the providers receiving the higher reimbursements were members of the plan's board of directors through FBH. Second, under the plan's capitation rate formula, increasing FHP's spending on behavioral health services in 2013 resulted in AHCA maintaining or increasing its premium payments in 2014. Thus, retaining (and spending) the excess payments increased FHP's revenue in 2014.

44.     The only purpose of retroactively increasing reimbursement rates mid-year was to avoid FHP's statutory and contractual requirement to refund excess payments to Medicaid. Because FHP increased its rates solely to avoid a known obligation to refund money, the increases are not bona fide expenses for purposes of the 80/20 requirement.

**b.** **FHP Applied the Increased Rates Retroactively to Prior Claims**

45. In this instance, the increase in reimbursement rates was particularly brazen because FHP applied them retroactively to January 1, 2013. To implement the retroactive increase, FHP applied the new, higher rates to claims that providers had submitted for services rendered between January and the date when the new contracts went into effect. In most cases, FHP had already paid those claims. Upon recalculation, FHP sent the providers an additional payment, reflecting the rate increase.

46. FHP's additional payments were not made for the provision of behavioral health services. For purposes of the 80/20 requirement, FHP's expenditures with respect to the provision of those services were already complete. The additional payments that FHP made to the providers were simply a gratuitous transfer intended to retain excess premiums otherwise owed to Medicaid.

**B.** **Implementation of the Scheme**

47. In April 2013, Relator met with Marc Reiner, the then-COO of ValueOptions Florida, at ValueOptions' administrative offices in Tampa. ValueOptions had recently reassigned Mr. Reiner to take over management of FHP. Previously, Mr. Reiner was the CEO of ValueOptions Maryland.

48. Shortly after their meeting, Mr. Reiner included Relator on a conference call with senior ValueOptions management to discuss the FHP rate increases.

49. In May or June 2013, the rate increases were approved by FHP's board of directors, which consisted of representatives from both FHP and FBH. Soon after the board's approval, FHP began to implement the scheme by amending its provider contracts to include new rate schedules.

50.     In June 2013, Tricia Pierce, a Regional Director of Network Contracts at ValueOptions, sent amended provider agreements to Relator for a limited number of FHP providers. Relator and his staff, including Ms. Pierce, were responsible for negotiating contract modifications with providers. In this instance, however, there were no negotiations with FHP providers leading up to the contract amendments. The amended provider agreements, including their new rate schedules, had come solely from ValueOptions.

51.     In reviewing the contracts' rate schedules, Relator noticed that the rates were significantly higher than FHP's typical rates, and that the rates were retroactive to January 1, 2013. In the course of his employment with ValueOptions, Relator had never before seen, let alone signed, a contract that included retroactive pricing.

52.     Relator realized that FHP had amended the provider contracts in order to increase its spending on behavioral health services and thereby avoid its refund obligations under the 80/20 requirement. Relator asked Ms. Pierce whether the purpose of the contract amendments was to avoid FHP's refund obligation, and Ms. Pierce said that it was.

53.     As ValueOptions's National Vice President for Contracting, it was Relator's responsibility to approve and sign all provider contracts within the Public Sector Division. Based on his knowledge of the purpose of FHP's retroactive rate increases, however, Relator refused to sign the amended provider agreements. Relator informed Ms. Pierce of his concern that the amendments were designed to avoid the 80/20 requirement and asked that she relay his concerns to Mr. Reiner. Ms. Pierce later informed Relator that she had done so.

54.     Soon thereafter, Mr. Reiner called Relator about his refusal to sign the amended contracts, and Relator explained his concern about the nature of the FHP rate increases. Mr. Reiner acknowledged Relator's concern but did not respond to it.

55.     After his conversation with Mr. Reiner, Relator spoke with his manager, Nancy

Martin, ValueOptions's Senior Vice President for National Network Services and Medicare

Advantage Health Plan Operations, to detail his apprehensions about the retroactive rate

increases. Ms. Martin told Relator that she was receptive to the concerns he had raised and

agreed with them in general. She asked Relator to put his concerns in writing, and told him that

she would take the issue up with others. Relator sent Ms. Martin an email restating his concerns,

but never heard back from her about the issue.

56.     During that same period, senior ValueOptions management, including Relator,

addressed the FHP retroactive rate increases during a regularly-scheduled operations team

conference call for ValueOptions Florida.

57.     Having voiced his objections and refused to sign the contracts, Relator assumed

that the contracts would not go into effect. Relator soon learned from Ms. Pierce, however, that

Mr. Reiner had circumvented the Contracting Department and approved the contracts himself.

According to Ms. Pierce, Mr. Reiner had signed the amended contracts, though it was not within

his ordinary responsibilities to do so. In Relator's experience, it was unprecedented for a

regional manager to execute provider contracts without involving the Contracting Department.

58.     In the same conversation, Ms. Pierce also reported to Relator that ValueOptions

had loaded the increased rates into its contract management systems, and that ValueOptions was

reprocessing FHP's previously paid claims at the rate schedules set forth in the amended

contracts.

C.     **Defendants' False Claims and False Statements to Medicaid**

59.     As a PMHP, FHP was required to file an Expenditure Report with AHCA on or

about April 2014. The Expenditure Report was required to include a breakdown of FHP's

expenditures on behavioral health services during 2013.

60.     To the extent that the behavioral health expenses that FHP listed in the Expenditure Report were less than 80% of its capitation payments, FHP was required to return the difference to AHCA no later than April 1, 2014.

61.     The behavioral health expenses that FHP listed in its Expenditure Report included the rate increases that Defendants had implemented through the amended provider contracts. Because FHP incurred the cost to avoid its obligations under the 80/20 requirement, and not for the provision of behavioral health services, its Expenditure Report overstated its behavioral health expenses and thus the ratio of those expenses relative to FHP's capitation payments.

62.     By knowingly overstating its expenditures on behavioral health services in the Expenditure Report, FHP made false representations that were material to its obligation to return the excess payments it had received from Medicaid, as well as deliberately and wrongfully avoided and concealed that obligation.

63.     When FHP submitted the Expenditure Report, it was also required to certify that all the data and documents it had submitted were accurate, truthful, and complete to the best of its knowledge. Because of Defendants' fraudulent scheme to overstate FHP's behavioral health expenses in the Expenditure Report, FHP's certification that the data and documents it had submitted were "accurate, truthful, and complete" was false.

64.     In addition, the behavioral health expenses that FHP reported to AHCA in the Expenditure Report affected the capitation rates that FHP received from AHCA in the following year. By overstating FHP's behavioral health expenses in 2013, Defendants caused AHCA to increase FHP's capitation rate in 2014. As a result, Defendants submitted false claims to AHCA for increased capitation payments in 2014 and, through the Expenditure Report, made false representations that were material to such false claims.

65.    Through this fraudulent course of conduct, Defendants knowingly and improperly avoided and concealed an obligation to return funds to Medicaid, made or caused to be made false records or statements material to that obligation, submitted or caused the submission of false claims for increased capitation payments in 2014, and made or caused to be made false records and false statements that were material to those false claims.

66.    Through these actions, Defendants violated the False Claims Act and the Florida False Claims Act.

**COUNT I**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)–(C), (G)**

67.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 66 above as though fully set forth herein.

68.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, *et seq.*, as amended.

69.    Defendants knowingly presented, or have caused to be presented, false or fraudulent claims for payment to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

70.    Defendants knowingly made or used, or caused to be made or used, false records or statements to get the United States to pay or approve false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

71.    Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, and knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the federal government, in violation of 31 U.S.C. § 3729(a)(1)(G).

72.    Defendants knowingly conspired to violate the stated provisions, in violation of 31 U.S.C. § 3729(a)(1)(C).

73.    Relator has no control over Defendants and no access to records they possess. Relator's allegation that Defendants submitted or caused the submission of false claims is based on Defendants' misrepresentation of FHP's behavioral health expenditures, which increased FHP's capitation rates under its contracts and thus the amount of its claims to Medicaid.

74.    The United States Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

75.    Defendants have damaged, and continue to damage, the United States in a substantial amount to be determined at trial.

76.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

**Count II**
**Florida False Claims Act**
**Fla. Stat. Ann. § 68.082(2)(a)–(c), (g)**

77.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 66 above as though fully set forth herein.

78.    This is a claim for treble damages and penalties under the Florida False Claims Act.

79.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval, in violation of Fla. Stat. Ann. § 68.082(2)(a).

80.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims, in violation of Fla. Stat. Ann. § 68.082(2)(b).

81. Defendants knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Florida State Government, and knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Florida State Government, in violation of Fla. Stat. Ann. § 68.082(2)(g).

82. Defendants knowingly conspired to violate the stated provisions, in violation of Fla. Stat. Ann. § 68.082(2)(c).

83. Relator has no control over Defendants and no access to records they possess. Relator's allegation that Defendants submitted or caused the submission of false claims is based on Defendants' misrepresentation of FHP's behavioral health expenditures, which increased FHP's capitation rates under its contracts and thus the amount of its claims to Medicaid.

84. The Florida State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

85. Defendants have damaged, and continue to damage, the State of Florida in a substantial amount to be determined at trial.

86. Additionally, the Florida State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## VI. **PRAYER**

WHEREFORE, Relator prays for judgment against Defendants as follows:

1. That Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 *et seq.*;

2. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States and the State of Florida have sustained because

of Defendants' actions, plus the maximum civil penalty permitted for each violation of the False Claims Act and the Florida False Claims Act;

      3.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act and the equivalent provisions of the Florida False Claims Act;

      4.    That Relator be awarded all fees, costs, and expenses incurred in connection with this action, including attorneys' fees, costs, and expenses; and

      5.    That Relator recover such other relief as the Court deems just and proper.

## VII.  **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: September 1, 2015

      Respectfully submitted,

      C. Richard Newsome, Esq.
      FL Bar No. 827258
      William C. Ourand, Esq.
      FL Bar No. 092503
      NEWSOME MELTON
      201 South Orange Avenue, Suite 1500
      Orlando, FL 32801
      Tel: (407) 648-5977
      Fax: (407) 648 5282
      newsome@newsomelaw.com
      ourand@newsomelaw.com

      Erika A. Kelton*
      ekelton@phillipsandcohen.com
      Edward H. Arens*
      earens@pcsf.com
      Taeva Shefler*
      tshefler@pcsf.com
      PHILLIPS & COHEN LLP
      100 The Embarcadero, Suite 300

San Francisco, CA 94105
Tel:  (415) 836-9000
Fax:  (415) 836-9001

Attorneys for *Qui Tam* Plaintiff Francis Del Pinto

**\*** *Motions for admission Pro Hac Vice to be filed*